RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0135p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JOHN CLEMENTE; BRIAN DAILEY; JOHN
WERKSMA; DENNIS STOL; KAREN STOL;
CHARLES TAYLOR II; GLENN RAY; BRIAN
DEPALMA,

          *Plaintiffs-Appellants,*

    *v.*

FRANK VASLO,

          *Defendant,*


STEVE DUCHANE; ROBERT BARTOK; CITY OF
LINCOLN PARK,

          *Defendants-Appellees.*

No. 10-2506

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:09-cv-13854—Robert H. Cleland, District Judge.

Decided and Filed: May 15, 2012

Before: MARTIN and McKEAGUE, Circuit Judges; CALDWELL, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Joel B. Sklar, Detroit, Michigan, Karen Mendelson, Ann Arbor, Michigan, for Appellants. Rosalind Rochkind, Roger A. Smith, GARAN LUCOW MILLER, P.C., Detroit, Michigan, Michael S. Borgen, PLUNKETT COONEY, Kalamazoo, Michigan, for Appellees.

---

[*]The Honorable Karen K. Caldwell, United States District Judge for the Eastern District of Kentucky, sitting by designation.

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge.   Plaintiffs, with the exception of Karen Stol, are former employees of the City of Lincoln Park who were terminated after the City determined that they had tampered with their water meters.  Plaintiffs claim that their Fourth Amendment rights were violated when city officials came to their homes to inspect their water meters and that they were terminated in retaliation for asserting those rights.  Additionally, one Plaintiff claims that he was discharged in violation of his First Amendment right to association.  The district court dismissed the Fourth Amendment claims against individual officials on qualified immunity grounds and granted summary judgment in favor of Defendants on the retaliation, right to association, and municipal liability claims.  We **AFFIRM**.

## I.  BACKGROUND

Defendant Steve Duchane is the manager of the City of Lincoln Park ("City"). He met several times with outside auditors regarding the City's loss of water revenue. One of the auditors suggested water theft as a possible explanation, and Duchane decided to investigate.  Mazhgon Rajaee, a City intern, was given the task of preparing a water usage study surveying active and retired public employees. City employees were chosen to be the test group because the City already possessed information regarding the number of household members in each home, facilitating analysis.  Rajaee used two years of billing information to complete her study.  The study showed that the average water usage over that two-year period was 162 units for active employees and 146 units for retirees.  The study also showed that the nine lowest consumers were all employees of the Department of Public Services ("DPS").  This group of nine consisted of Ronald

DePalma, Michael Shaffer, and all of the Plaintiffs except Karen Stol, who was not a DPS employee.[1]

Duchane discussed these results with City Attorney Edward Zelenak and scheduled a meeting with the Wayne County Prosecutor's Office. Assistant Prosecuting Attorney Richard Hathaway suggested that the City investigate whether the water meters had been physically tampered with. Deputy Brian White, a Detective with the Wayne County Sheriff's Department, was assigned to assist the City with its investigation.

Robert Bartok, the Director of DPS, and White met with Duchane to discuss the investigation. With guidance from the prosecutor's office, they developed a tiered plan to gain access to the water meters. First, Bartok and White would ask the resident if they could inspect the meter. If access was refused, they would ask the resident if they could inspect the meter pursuant to a city ordinance that allows city officials to enter, with the occupant's approval, any premises with water service for the purpose of inspecting the meter.[2] If refused access again, Mr. Bartok would give a direct order as the resident's supervisor to see the meter. If the resident continued to refuse access to the meter, White and Bartok would leave the residence and seek a warrant.

Bartok and White visited DPS employees suspected of water theft on June 30, 2009. They first visited Ronald DePalma, a DPS Supervisor. Bartok and White requested to inspect the water meter. DePalma consented and led Bartok and White to

---

[1] The nine lowest consumers and their consumption rates over the test period were the following: Dennis Stol (29 units), Ronald DePalma (31 units), John Clemente (42 units), John Werksma (44 units), Brian Dailey (46 units), Glenn Ray (51 units), Michael Shaffer (69 units), Charles Taylor (70 units), and Brian DePalma (71 units).

[2] Lincoln Park's City Ordinance No. 1042.08, governing "Right of Entry and Repair of Connections," provides that "[t]he duly constituted authorities of the City may, at all reasonable hours, enter, with the occupant's approval, upon any premises where water service is established for the purpose of inspecting and making an examination of the water meter and outward therefrom to the curb stop. Such City authorities may require water connections to meters to be repaired, removed, replaced or changed where the same are defective or not in compliance with this chapter or other applicable ordinances of the City as such authorities deem necessary. If such repair, replacement, or alteration is not made as required, the City may make such repair, replacement or alteration and charge the actual cost thereof to the parties. Any persons whose premises are supplied with water shall be deemed as having assented to the provisions of this chapter."

City Ordinance No. 1042.12 states that "[n]o person shall damage, break, remove, modify, alter or tamper with any water meter for the purpose of providing water to any premises without going through the meter.

the meter. The meter head was leaning to one side and a screw was out of place. DePalma admitted to having turned the meter on and off. He ultimately resigned from his position with the City and is not a party to this case.

Next, Bartok and White went to the home of Plaintiffs Dennis and Karen Stol. Mrs. Stol testified that Detective White said he and Bartok "[had] to come in and look at the meter," that she said "no" a couple of times, and that she said she'd rather wait until her husband arrived home. She stated that Detective White was "very persistent and adamant about coming in." Mrs. Stol added that she let White and Bartok in only after she asked whether it would affect her husband's job and Bartok answered yes. Bartok, however, denied being asked that question, and both Bartok and White testified that, upon request, Mrs. Stol allowed them inside and led them to the meter. The Stols' meter head was not attached to the rest of the meter and a security screw was missing.

Plaintiff John Clemente's home was next. Bartok and White requested to see his water meter, but Clemente refused access into his home without a warrant. Bartok cited the city ordinance, to no avail. Bartok then gave Clemente a direct order to allow him to inspect the meter, but Clemente continued to refuse access. White informed Clemente that they could get a search warrant but would prefer it if Clemente just gave his authorization. White and Bartok testified that Clemente became animated, stating that "he knew what was going on" and was "going to call everyone to let them know what was going on." Bartok and White then left. Clemente testified that White acknowledged Clemente was not obligated to let them into his house without a warrant.

Bartok and White next visited Plaintiff Brian Dailey. They told Dailey of their intention to investigate illegal water usage and requested to see Dailey's water meter. Dailey refused to let them into his house without a warrant. Bartok cited the city ordinance and gave Dailey a direct order as his supervisor, but Dailey still refused entry, at which point Bartok and White left. Dailey testified that Bartok "got right in [his] face" and yelled when he gave the direct order.

Next, Bartok and White visited Plaintiff Charles Taylor. Nobody answered the door, so Bartok and White left. Bartok noted that Taylor had a pool and nice landscaping.

Bartok and White then visited Plaintiff Glenn Ray. They explained they were investigating water meter tampering and requested to see Ray's water meter. Bartok and White testified that Ray hesitated or seemed to think about it and then allowed Bartok and White inside to inspect the meter. Bartok stated he did not give Ray a direct order, but Ray testified that Bartok did so and additionally informed Ray that he had authority to inspect Ray's meter at any time. While guiding Bartok and White to the meter, Ray became agitated, saying, "I f–ed up," "you got me," "I'm sorry," and "I can't get fired," and began pacing, shaking, and sweating. Ray's meter was disconnected and the head was hanging from a wire.

Lastly, Bartok and White visited Plaintiff John Werksma. White informed Werksma that they were investigating water meter tampering and requested to look at Werksma's meter, upon which Werksma immediately complied. Werksma testified that he voluntarily let White and Bartok into his home. He stated he was anxious because he believed the city was trying to eliminate his position but that he did not resist White and Bartok's entry to his home. Upon viewing the meter, White and Bartok observed that the head was removed from the body. Werksma mentioned that plumbers must have knocked the meter head off the body.

After these inspections, Bartok and White submitted written reports to Duchane and the Wayne County Prosecutor's Office.

On July 14, 2009, Lieutenant Martin of the Lincoln Park Police, along with Bartok and Ed Collins, an independent plumbing contractor retained by the City, executed warrants to search for and seize the water meters located at the residences of Clemente, Dailey, Taylor, Brian DePalma, and Michael Shaffer. Bartok later submitted to Duchane a written report briefly reviewing each visit. He reported that Dailey's and Clemente's meters exhibited visible signs of tampering, that Taylor's and DePalma's meters did not show any immediate signs of malfunction, that Shaffer's meter showed

no tamper marks, and that both he and Collins concluded that Schaffer's meter had not been tampered with.

The seized meters were taken to an evidence room at the police department. The City retained Martin Ladd, Director of Public Services for the City of Hamtramck, to inspect them further. Ladd was not given the historical water usage of the Plaintiffs and instructed to simply inspect the physical condition of the meters for anything out of the ordinary. He testified that he found indications the meters were damaged or otherwise not normal, such as missing security pins, abnormal positioning of the meter heads, and scratches on the meter even though the pin was not damaged. He stated that such defects were not necessarily the result of intentional tampering and could have been caused by faulty installation. He could not definitively conclude, based on his inspection, that any of the Plaintiffs had tampered with their meter but stated that he would not rule it out as a possibility.

On July 24, 2009, Plaintiffs (except Karen Stol) were notified that the investigation had revealed evidence supporting charges that they improperly received water service and tampered with their meters. Plaintiffs were given an opportunity to respond to the charges. Disciplinary hearings were held, and Plaintiffs were ultimately terminated.

Following Plaintiffs' terminations, arbitration proceedings were held in accordance with their rights under their collective bargaining agreement. Arbitration award opinions issued for Stol, Clemente, Dailey, Taylor, and Brian DePalma. All five terminations were upheld by the arbitrator.

Plaintiffs then filed suit against Frank Vaslo (mayor of Lincoln Park), Duchane, Bartok, and the City for violations of their constitutional rights pursuant to 42 U.S.C. § 1983. The Stols, Ray, and Werksma alleged violations of their Fourth Amendment right to be free from unreasonable searches and seizures, claiming that their consent was coerced. Dailey, Clemente, and Taylor claimed they were terminated in retaliation for asserting their Fourth Amendment rights. Brian DePalma claimed that he was discharged simply because his brother, Ronald DePalma, admitted to tampering with his

water meter, which violated his First Amendment associational rights. Plaintiffs also alleged state law defamation claims.

The district court found that Duchane and Bartok were protected by qualified immunity on the Fourth Amendment claim and that they were entitled to summary judgment on Plaintiffs' retaliation and right to association claims. The court granted summary judgment in favor of Defendant Vaslo, finding Plaintiffs failed to allege any specific facts as to his involvement in the events and that he could not be held liable on a theory of respondeat superior.[3] The court also granted summary judgment in favor of the City, finding that Plaintiffs failed to establish a municipal policy or custom resulting in a deprivation of federal rights. Lastly, the district court dismissed without prejudice Plaintiffs' state law claims. *Clemente v. Vaslo*, No. 09-13854, 2010 WL 4636250 (E.D. Mich. Nov. 5, 2010).

## II. ANALYSIS

### A. Standard of Review

This Court reviews a district court's grant of summary judgment de novo. *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010). Summary judgment is appropriate when the materials in the record "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party." *Salling v. Budget Rent-A-Car Sys., Inc.*, 672 F.3d 442, 444 (6th Cir. 2012) (internal quotation marks omitted).

### B. Warrantless Search Claims of Stol, Ray, and Werksma

The Stols, Ray, and Werksma claim that their consent allowing Bartok and White into their homes to inspect their water meters was involuntary, resulting in an illegal search prohibited by the Fourth Amendment. Defendants claim their actions are protected by qualified immunity.

---

[3]Plaintiffs have not appealed this ruling; thus, Valso is not a party to this appeal.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Supreme Court has laid out a two-step inquiry to determine if qualified immunity protects an official's actions: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right[]," and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

### 1. Fourth Amendment Right

The right at issue is the Fourth Amendment right to be free of "unreasonable searches and seizures." U.S. Const. Amend. IV. "[A] search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (omission in original) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One of these specifically established exceptions is a search pursuant to consent, which must be voluntarily given. *Id.* "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. This includes considering the characteristics of the individual giving consent, such as "age, intelligence, and education"; whether the questioner engaged in "coercive or punishing conduct"; and the presence of "more subtle forms of coercion that might flaw an individual's judgment." *United States v. Beauchamp*, 659 F.3d 560, 572 (6th Cir. 2011) (alteration, citations, and internal quotation marks omitted). "The government bears the burden of proving, through clear and positive testimony[,] that the consent to search was given voluntarily." *Id.* at 571 (internal quotation marks omitted).

Plaintiff Werksma has failed to state a Fourth Amendment claim.  Werksma himself stated that he voluntarily let Bartok and White into his home.  Though Werksma also testified that he felt anxious because he believed the city was eliminating jobs, he did not act under any threats or other coercive tactics.  He has shown nothing more than that he acted voluntarily in a manner least likely to endanger his job.  As the Supreme Court has noted, "the question is not whether the [individual] acted in her ultimate self-interest, but whether she acted voluntarily." *United States v. Mendenhall*, 446 U.S. 544, 559 (1980).

The Stols and Ray, however, claim to have consented only after Bartok threatened their employment.  Karen Stol testified that she refused Bartok and White entry a couple times and let them in only upon being informed that the matter would affect her husband's job.  Ray testified that he let Bartok and White in because he was given a direct order.  The Stols and Ray argue that such threats to their jobs create an issue of fact as to whether consent was voluntary. We do not express an opinion on whether the alleged action constitutes coercion within the meaning of the Fourth Amendment and decide the issue on grounds that the law was not clearly established.

### 2.  Clearly Established Law

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier*, 533 U.S. at 201).  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2084 (2011) (citing *Saucier*, 533 U.S. at 201-02).  Thus, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

"We look first to the decisions of the Supreme Court, and then to the case law of this circuit in determining whether the right claimed was clearly established when the action

complained of occurred." *Gragg v. Ky. Cabinet for Workforce Dev*., 289 F.3d 958, 964 (6th Cir. 2002) (citing *Black v. Parke*, 4 F.3d 442, 445 (6th Cir. 1993)). "[T]he case law must 'dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*.'" *Id.* (quoting *Saylor v. Bd. of Educ. of Harlan Cnty.*, 118 F.3d 507, 515 (6th Cir. 1997)). Plaintiffs bear the burden of showing the claimed right was clearly established. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009).

Plaintiffs cite to *Uniformed Sanitation Men Ass'n, Inc.*, *v. Commissioner of Sanitation of the City of New York,* 392 U.S. 280 (1968) as the clearly established law that controls this case. There, the New York Commissioner of Investigation looked into allegations that employees of the Department of Sanitation were charging improper fees to use certain city facilities and pocketing the proceeds. The petitioners were 15 sanitation employees who were summoned before the Commissioner, and each was advised that pursuant to § 1123 of the New York City Charter,[4] "if he refused to testify with respect to his official conduct or that of any other city employee on the grounds of self-incrimination, his employment and eligibility for other city employment would terminate." 392 U.S. at 282. Twelve of the petitioners nonetheless asserted their constitutional privilege against self-incrimination and refused to testify, upon which they were dismissed "on the explicit ground . . . that they had refused to testify." *Id.* Three of the petitioners subjected themselves to questioning and denied the charges. They were suspended and subsequently summoned before a grand jury and asked to sign waivers of immunity, which they refused. After an administrative hearing, they were dismissed "on the sole ground that they had violated § 1123 of the City Charter by refusing to sign waivers of immunity." *Id.* at 282-83. The United States Supreme Court held that New

---

[4]That section provided: "If any councilman or other officer or employee of the city shall, after lawful notice or process, wilfully refuse or fail to appear before any court or judge, any legislative committee, or any officer, board or body authorized to conduct any hearing or inquiry, or having appeared shall refuse to testify or to answer any question regarding the property, government or affairs of the city or of any county included within its territorial limits, or regarding the nomination, election, appointment or official conduct of any officer or employee of the city or of any such county, on the ground that his answer would tend to incriminate him, or shall refuse to waive immunity from prosecution on account of any such matter in relation to which he may be asked to testify upon any such hearing or inquiry, his term or tenure of office or employment shall terminate and such office or employment shall be vacant, and he shall not be eligible to election or appointment to any office or employment under the city or any agency." *Uniformed Sanitation Men*, 392 U.S. at 282 n.3.

York could not force the petitioners to choose between surrendering their constitutional rights or their jobs and concluded they had been wrongfully dismissed. *Id.* at 284-85.

*Gardner v. Broderick*, 392 U.S. 273 (1968), the companion case to *Uniformed Sanitation Men*, involved similar facts and came to a similar conclusion. There, a police officer was summoned to testify before a grand jury and was asked to sign a waiver of immunity after being told he would be fired if he did not sign one. He refused, was given an administrative hearing, and was discharged solely for this refusal. *Gardner*, 392 U.S. at 274-75. Though the Court acknowledged that one's privilege against self-incrimination can be knowingly and voluntarily waived, it concluded that "the mandate of the great privilege against self-incrimination does not tolerate the attempt, regardless of its ultimate effectiveness, to coerce a waiver of the immunity it confers on penalty of the loss of employment." *Id.* at 279.

One more case bears mention. *Garrity v. New Jersey*, 385 U.S. 493 (1967), a counterpart to the aforementioned Supreme Court cases, involved police officers under investigation who were informed they could claim their privilege against self-incrimination but that refusal to answer a question would subject them to termination. The appellant officers did not claim the privilege and answered the questions, which answers then led to their criminal prosecutions and convictions. The *Garrity* Court held that the officers' statements were products of coercion obtained in violation of due process:

> The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or remain silent. That practice . . . is likely to exert such pressure on an individual as to disable him from making a free and rational choice. We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.

385 U.S. at 497-98 (citation and internal quotation marks omitted).

Though *Uniformed Sanitation Men* and its ilk involved the Fifth Amendment rather than the Fourth, the cases may stand for the broader proposition that public employees cannot be given a stark choice between asserting a constitutional right and keeping their jobs. *See Uniformed Sanitation Men,* 392 U.S. at 284 (finding that the offensive aspect of the

proceedings against petitioners was that they "present[ed] them with a choice between surrendering their constitutional rights or their jobs"). As *Garrity* explained, the presentment of such a choice is coercive.[5] 385 U.S. at 497-98. The Sixth Circuit cases on this issue fall well within the clearly established law, upholding employer actions where the employees were not required to give up constitutional protections in order to keep their employment. *See Wood v. Summit Cnty. Fiscal Office*, 377 F. App'x 512, 515 (6th Cir. 2010) (finding no Fifth Amendment violation where plaintiff was terminated after he declined to attend a disciplinary hearing even though he had been informed he would not be required to waive his Fifth Amendment privilege); *Lingler v. Fechko*, 312 F.3d 237, 239-40 (6th Cir. 2002) (finding no Fifth Amendment violation where police chief exacted statements from officers because there was no evidence police officers had been required to waive privilege against self-incrimination).

Plaintiffs contend that Duchane and Bartok did exactly what was clearly disallowed by *Uniformed Sanitation Men* and *Gardner*: forced Plaintiffs to surrender either their constitutional rights or their jobs. However, what actually transpired—taking Plaintiffs' version of the facts as we must—is a step removed. In order to gain access to the water meters, Bartok and White acted pursuant to a sliding scale: (1) they asked permission to inspect the meter, (2) they informed the occupant that a city ordinance gave the city the right to inspect the meter, and (3) Bartok gave a direct order as Plaintiffs' supervisor to show them the meter. Where the employee continued to refuse access, as Clemente and Dailey did, Bartok and White respected his Fourth Amendment rights and left. What is clearly established is only that public employers may not coerce their employees to abdicate their constitutional rights on pain of dismissal, and that is not what happened here.

---

[5]Though *Garrity* drew from the Court's cases on the voluntariness of confessions under the Due Process Clause of the Fourteenth Amendment, such analysis is equally applicable to the voluntariness of consent under the Fourth Amendment. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 223-29 (1973) (drawing from Fourteenth Amendment confession law to determine the meaning of voluntariness under the consent exception to the warrant and probable cause requirements of the Fourth Amendment and concluding that "there is no reason for us to depart in the area of consent searches, from the traditional definition of 'voluntariness'").

Plaintiffs cite to an Eighth Circuit case, *Lesher v. Reed*, 12 F.3d 148 (8th Cir. 1994), which neither is controlling nor would clearly establish the law even were it from this Circuit because it falls squarely within *Uniformed Sanitation Men*. There, a police officer who had a possessory interest in a dog refused to give the dog to the police department until threatened that he would be relieved of duty if he did not do so. The Eighth Circuit found that this was a seizure within the meaning of the Fourth Amendment. Though the court remanded for a determination on whether the warrantless seizure was justified by an exception, it noted, citing to *Uniformed Sanitation Men*, that "the State may not coerce [public employees] into relinquishing a constitutional guarantee under threat of losing their employment." *Lesher*, 12 F.3d at 150.

Defendants' actual conduct highlights the blurriness of the Fourth Amendment's contours in the context of an employer-employee relationship. Bartok and White acted on a gradient, applying more pressure at each step to obtain consent (simply asking, then citing to a city ordinance, then giving a direct order as supervisor), but never forced Plaintiffs to choose between letting them in or losing their jobs. Though we do not decide the issue, we note that a supervisor's direct order may be coercive in some situations, as it may be reasonable for an employee to believe that disobeying it will result in termination. The question, however, is not whether such conduct could possibly constitute a Fourth Amendment violation but whether, according to settled Supreme Court and Sixth Circuit precedent at the time, such conduct was so clearly violative of the Fourth Amendment that it is beyond debate. *See al-Kidd*, 131 S.Ct. at 2083 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). Short of threatening termination, what public employers could do to obtain an employee's consent to conduct an inspection was not clearly established. Duchane and Bartok are thus entitled to qualified immunity.

A Ninth Circuit decision came to the same conclusion in a somewhat analogous factual scenario. *Delia v. City of Rialto*, 621 F.3d 1069, 1071 (9th Cir. 2010)*, rev'd on other grounds*, *Filarsky v. Delia*, — U.S. —, 132 S. Ct. 1657 (2012), involved a firefighter, Delia, who obtained several off-duty work orders for medical reasons. The city became suspicious of Delia's frequent off-work status and retained a private attorney to investigate. At an

administrative interview, the attorney asked Delia if he was undertaking any home construction projects, and Delia responded that he had purchased some rolls of insulation which were sitting, still bagged, in his house.  To verify that Delia was telling the truth, the attorney tried to obtain Delia's consent to allow a battalion chief to search his home for the rolls of insulation.  *Id.* at 1072.  Delia refused.  The attorney next asked if Delia would go home and bring out the rolls of insulation himself for inspection.  Again, Delia refused.  The attorney ultimately obtained a written order from the fire chief ordering Delia to produce the insulation for inspection, to which Delia complied.  *Id.* at 1072-73.  Delia subsequently filed a § 1983 suit claiming violations of his Fourth Amendment rights.

The Ninth Circuit held that this compelled search of Delia's own home was a Fourth Amendment violation.  *Id.* at 1075.  However, the court went on to note that "this case does not fit neatly into any previous category of Fourth Amendment law" and decided that the right at issue was not clearly established.  *Id.* at 1078.  After reviewing the Supreme Court's decisions in *Uniformed Sanitation Men* and *Gardner*, the court concluded: "Neither case involved the legality of a search under the Fourth Amendment.  Accordingly, neither *Gardner* nor *Uniformed Sanitation Men* would have put defendants on notice that [the fire chief's] order to Delia, with no attendant threat to his employment, constituted a violation of the Fourth Amendment."  *Id.* at 1079.  Accordingly, the fire chief who ordered Delia to comply with the inspection and the firefighters who carried it out were granted qualified immunity.  Similarly, *Uniformed Sanitation Men* and *Gardner* were not sufficient to put Duchane and Bartok on notice that their progressive series of questions and orders, with no attendant threat of termination, rose to the level of a Fourth Amendment violation.

## C.  Retaliation Claims of Dailey, Clemente, and Taylor

Plaintiffs Dailey and Clemente asserted their Fourth Amendment rights by requiring Bartok and White to get a warrant.  Plaintiff Taylor did not answer the door, but the district court found that in the light most favorable to plaintiffs, Taylor could be seen as exercising his Fourth Amendment right by purposely avoiding Bartok and White.  *Clemente*, 2010 WL 4636250, at *7.  The question regarding these Plaintiffs is whether they have raised a genuine

issue of material fact sufficient to survive summary judgement on their claim that they were terminated in retaliation for exercising their constitutional rights.

"[R]etaliation for the exercise of constitutional rights is itself a violation of the Constitution." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)).  This Circuit has outlined the basic elements of a retaliation claim: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Id.*; *see also Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).  Once the plaintiff meets her burden of establishing that her protected conduct was a motivating factor of the adverse action, the burden of production shifts to the defendant to show, by a preponderance of the evidence, that she would have taken the same action regardless of plaintiff's protected activity. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).[6]

Steps 1 and 2 are not disputed.  The district court determined that Plaintiffs did not establish a genuine issue of material fact on whether their exercise of Fourth Amendment rights caused the termination, thus failing to meet their burden under Step 3.

Plaintiffs offer the following as evidence of a causal connection between their termination and their assertion of their Fourth Amendment rights: (1) the water usage study was incomplete and unreliable; (2) not all DPS employees with water use under 71 units were investigated; and (3) Martin Ladd's opinion was inconclusive as to whether Plaintiffs' meters had been tampered with.  In Plaintiffs' reply brief, they add the fact that (4) the notices of Plaintiffs' disciplinary hearings listed disobeying a direct order as one incident of misconduct.

---

[6]The elements of a retaliation claim and the burden-shifting framework are taken from cases involving alleged retaliation for exercising First Amendment rights.  Both parties agree that this framework applies here, and we find no reason to analyze a retaliation claim grounded on the Fourth Amendment differently from one grounded on the First.  As *Thaddeus-X* demonstrated, the essential framework for analyzing retaliation claims is consistent across different contexts, constitutional and statutory.  175 F.3d at 386-87, 394.

Reasons (1) and (2) have no bearing on the retaliation claim because the water usage study and decision to investigate certain but not all DPS employees with less than 71 units of water usage occurred before Dailey, Clemente, and Taylor ever asserted their Fourth Amendment rights. Pointing to the deficiencies in the process leading up to the investigation is simply an attempt to contest the merits of the adverse employment decisions cloaked in the guise of a Fourth Amendment claim.

Neither do (3) and (4) establish a causal link. Ladd's testimony applies to Brian DePalma as well, who did not assert his Fourth Amendment rights, and the virtually identical notices of hearing apply to all Plaintiffs; thus, it is unclear how these two pieces of evidence show specifically that Clemente, Dailey, and Taylor were terminated in retaliation. Again, Plaintiffs seem to be contesting the correctness of their terminations rather than connecting their terminations specifically to their assertion of Fourth Amendment rights.

Further, even assuming Plaintiffs could show a causal connection, Defendants have met their burden to show that they "would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287. While this "burden involves a determination of fact and ordinarily is reserved for a jury or the court in its fact-finding role," *Rodgers v. Banks*, 344 F.3d 587, 603 (6th Cir. 2003) (internal quotation marks omitted), here, a remand is unnecessary to determine whether Defendants would have terminated Plaintiffs even had they acquiesced to White and Bartok's orders. The terminations of Plaintiffs who did not assert their Fourth Amendment rights—Stol, Ray, Werksma, and DePalma—answer in the affirmative. We find it abundantly clear that, rightly or wrongly, Plaintiffs were terminated for reasons related to the water usage study and meter inspection, not for asserting their Fourth Amendment rights.

Though Plaintiffs claim that Duchane attributed Clemente, Dailey, and Taylor's assertion of rights to all of them, we find this the sort of "mere speculation, conjecture, or fantasy" insufficient to survive a motion for summary judgment. *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (internal quotation marks omitted). And, in any event, such claim is contradicted by Plaintiffs' termination letters, which were individualized. We agree with the district court that "[e]ven in a light most favorable to Plaintiffs, the record evidence

indicates that they were terminated for cause—not in retaliation." *Clemente*, 2010 WL 4636250, at *7.

## D.  Retaliation Claim of DePalma

Plaintiff Brian DePalma alleges that Defendants violated his First Amendment right to freely associate by terminating his employment because of his relationship with his brother, Ronald DePalma, who admitted to tampering with his water meter.[7]  It is undisputed that DePalma has a constitutional right to associate with members of his family, *see Johnson v. City of Cincinnati*, 310 F.3d 484, 498-99 (6th Cir. 2002), and that his termination was an adverse action.  However, DePalma has failed to put forth any evidence upon which a reasonable factfinder could find a causal connection between his familial relationship and his termination.

To show such a connection, DePalma points to the fact that he was not a subject of investigation until after his brother Ronald admitted to tampering with his own meter.  While true that Brian DePalma was not visited on June 30 like the other Plaintiffs and was not investigated until a search warrant was executed at his home on July 14, this does not support an inference that Brian DePalma was investigated (and subsequently fired) because of his relationship to Ronald.

Duchane had cause to suspect Brian DePalma of tampering with his meter prior to July 14, as the water usage compilation showed that he was the ninth lowest consumer out of all the surveyed active city employees.  Duchane responded appropriately by obtaining a warrant and seizing his meter.  Duchane testified that he, Bartok, and White decided to skip over Brian DePalma's house on June 30 because Ronald DePalma was on the list as well, and they thought Ronald would immediately warn Brian about the visit.[8]  Bartok reported that Ladd found that

---

[7]We note that Brian DePalma's claimed right is more accurately grounded on the freedom of intimate association, which is protected as a fundamental liberty interest arising under the Fourteenth Amendment's Due Process Clause, rather than on the First Amendment's free speech, assembly, and petition rights. *See generally Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984); *Moore v. City of East Cleveland*, 431 U.S. 494 (1977); *Johnson v. City of Cincinnati*, 310 F.3d 484, 498-99 (6th Cir. 2002).  In any event, DePalma has failed to establish any causal connection between his family relationship and termination.

[8]Even if this reason is unsatisfactory, as DePalma asserts, DePalma has still failed to show that his investigation and termination were motivated by his relation to Ronald rather than his low water usage and other evidence of tampering with his meter.

the security pin in Brian DePalma's meter was "hastily put in" and that it appeared to have been pushed in and out a number of times. DePalma's termination letter relied on these findings, as well as the circumstantial evidence of his historically low water usage. As the district court correctly found, both brothers independently met the criteria to be suspected of meter tampering and terminated.

DePalma attempts to show that he was treated differently from similarly situated employees to support an inference of retaliatory animus: he claims that his water usage was greater than two other active city employees whose homes were not searched, Michael Schaffer and Brian Keene. First, DePalma's claims are factually false. Mike Shaffer's home was, in fact, visited and his meter seized on July 14.[9] And DePalma's usage was not greater than Keene's but the same (both 71 units). Secondly, upon closer examination, Schaffer and Keene are not actually similarly situated to DePalma. Schaffer, for one, was found not to have tampered with his meter. Keene, Duchane explained, was not investigated despite having the same usage as DePalma because Keene was not part of DPS and Duchane wanted to start with the nine DPS employees who were at the bottom of the water usage study.

Regardless of whether Duchane's explanations are satisfactory, DePalma has simply failed to present any evidence from which a reasonable jury could conclude that his investigation and termination was motivated by his familial relationship, rather than his low water usage or status as a DPS employee. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." (citations omitted)).

## E. Municipal Liability

The City of Lincoln Park argues that Plaintiffs abandoned their claims against the City because the claims were not set forth in Plaintiffs' opening appellate brief. We agree. Plaintiffs here made no mention of municipal liability in their opening brief, even though they were

---

[9]Schaffer was also among the nine lowest users and treated similarly to DePalma in that he was not visited on June 30 but investigated later on July 14 pursuant to a search warrant.

clearly on notice that the district court decided the municipal liability issue against them and that it was a proper issue for appeal.  Their claims are thus abandoned.  *United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006) ("[A]n appellant abandons all issues not raised and argued in its initial brief on appeal." (alteration in original) (internal quotation marks omitted)).

Though Plaintiffs address the issue in their reply brief, "[w]e have consistently held . . . that arguments made to us for the first time in a reply brief are waived." *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010).  Further, even if had they raised their argument at the appropriate time, we would find it waived on grounds that it is "adverted to . . . in a perfunctory manner, unaccompanied by some effort at developed argumentation."  *Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007) (internal quotation marks omitted). Plaintiffs' municipal liability argument consists of a conclusory allegation that Duchane is a policymaker, the incorrect assertion that whether Duchane is a policymaker is a question of fact for a jury, *see Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) ("[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury."), and recitations of facts attempting to establish each Plaintiff's innocence of meter tampering irrelevant to the question of municipal liability.  Even were we to consider Plaintiffs' belated argument, they have given us nothing to consider.

## III. CONCLUSION

Plaintiffs have abandoned their claims against Defendant Vaslo and the City of Lincoln Park.  On all other issues, we **AFFIRM** the judgment of the district court.