RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0200p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────

DENISE M. COLEY, Administrator of the estate of
Carlton L. Benton; DECARLOS A. BENTON; M. L., a
minor; CARLA BENTON,

                    *Plaintiffs-Appellees,*

    *v.*

LUCAS COUNTY, OHIO, et al.,

                    *Defendants,*

JOHN E. GRAY (14-3134); JAY M. SCHMELTZ (14-
3136); JAMES A. TELB (14-3137),

                    *Defendants-Appellants.*

Nos. 14-3134/3136/3137

─────────────

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:09-cv-00008—Vernelis K. Armstrong, Magistrate Judge.

Argued: December 2, 2014

Decided and Filed: August 21, 2015

Before: SILER, SUTTON, and STRANCH, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Joseph S. Simpson, SHUMAKER, LOOP & KENDRICK, LLP, Toledo, Ohio, for
Appellant in 14-3134. Thomas J. Antonini, ROBISON, CURPHEY & O'CONNELL, Toledo,
Ohio, for Appellant in 14-3136. Dennis A. Lyle, ANSPACH MEEKS ELLENBERGER LLP,
Toledo, Ohio, for Appellant in 14-3137. Aparesh Paul, LEVIN & ASSOCIATES CO., L.P.A.,
Cleveland, Ohio, for Appellees. **ON BRIEF:** Joseph S. Simpson, SHUMAKER, LOOP &
KENDRICK, LLP, Toledo, Ohio, for Appellant in 14-3134. Thomas J. Antonini, ROBISON,
CURPHEY & O'CONNELL, Toledo, Ohio, for Appellant in 14-3136. Dennis A. Lyle,
ANSPACH MEEKS ELLENBERGER LLP, Toledo, Ohio, for Appellant in 14-3137. Aparesh
Paul, Joel Levin, LEVIN & ASSOCIATES CO., L.P.A., Cleveland, Ohio, for Appellees.

1

_____

**OPINION**

_____

JANE B. STRANCH, Circuit Judge.  The family of Carlton Benton, a pretrial detainee, was told that he died of natural causes in the Lucas County jail in 2004.  This case, alleging claims under 42 U.S.C. § 1983 and state law, was brought in 2008 when family members discovered that jail employees had shoved Benton to a cement floor, held him in a chokehold to the point of unconsciousness, left him to die in his cell, and then engaged in a cover-up with the aid of their Sheriff.  The district court refused to grant the motions to dismiss of Officer Jay Schmeltz, Sergeant John Gray, and Sheriff James Telb, denying their requests for qualified and state statutory immunity.  Defendants appeal.  We find that these appeals of the denial of immunity lack any meritorious basis.  We AFFIRM the district court's orders denying Schmeltz, Gray, and Telb qualified and statutory immunity and return the case to the district court for expeditious handling.

## I.  BACKGROUND

### A.  Facts Alleged in the Complaint

Lucas County took Carlton Benton into custody in February 2004 as a pretrial detainee. In late May, Benton was taken to St. Vincent's Hospital in Toledo, Ohio, where he received medical treatment for seizures.  In preparing to transfer Benton back to the Lucas County jail from the hospital, Lucas County employees, including Officer Jay M. Schmeltz, disengaged Benton from various kinds of medical equipment and the restraints that bound him to the hospital bed.  During this process, Benton resisted, and Lucas County employees sprayed him with chemicals and repeatedly struck his torso and upper body.  Benton was subdued, placed in handcuffs, the handcuffs were secured to a belly chain, and he was placed in leg irons.  He was then seated in a wheelchair, loaded into a van, and transported back to the Lucas County Jail without further incident.

According to the operative complaint—the Second Amended Complaint—here is what happened next.  Plaintiffs allege that Schmeltz was "frustrated, agitated, and angry" as a result of

the altercation with Benton at the hospital. Upon arrival at the jail, Schmeltz lifted Benton from the wheelchair and escorted him through the jail's booking area. In his shackled state, Benton could only "shuffle" with "short and unbalanced steps." While in the booking area, Schmeltz, "with malice, and in bad faith, with the intention of causing harm and injury," "shoved and struck" Benton from behind, "causing him to fall straight to the [cement] floor," "striking his head on the wall" as he fell. Benton was powerless to break his fall. Sergeant John E. Gray and other officers in the booking area witnessed this event.

Schmeltz then pulled Benton up from the floor and, with the help of Gray and others, escorted Benton to the second floor medical unit. Once inside a cell, Schmeltz, Gray, and other deputies placed Benton on a bed, handcuffed him to the bed, and attempted to remove his many restraints. During this process, Benton began to "squirm around, struggle, and moved his legs, making it more difficult to get a hold of him to remove the restraints." Although he was moving, Benton was "restrained and not posing any threat" to anyone present. Allegedly "frustrated, agitated and angry" that it was difficult to remove handcuffs, belly chain and leg irons, Gray grasped Benton from behind and placed him in a chokehold. When Gray applied the chokehold, Benton stopped resisting and gasped for air, "making choking and other gurgling sounds." Hearing the gurgling sounds, another officer told Gray to stop choking Benton, but Gray would not release the chokehold. A few seconds later, he went limp and became unconscious. Once Benton was unconscious, the officers removed his restraints. Gray then instructed the other officers to leave the cell. Benton lay "silent, motionless, [and] limp."

Although aware that Benton was unconscious, Gray knowingly and intentionally failed to inform any of the nurses or other medical personnel working just outside the medical cell that he had used a chokehold on Benton or that he was unconscious. Gray later admitted that he heard Benton gasping and gurgling and knew that he should have told medical personnel about what had occurred. Approximately ten minutes later, a Lucas County deputy on regular rounds entered Benton's cell and discovered that he was unconscious and not breathing. County personnel then transported Benton by ambulance to St. Vincent's Hospital. There he was pronounced brain dead on June 1, 2004 and removed from life support the following day.

Gray and Schmeltz made false entries in official reports chronicling the incidents that related to Benton's death, intentionally and knowingly failing to state that Schmeltz had shoved Benton to the cement floor of the jail or that Gray had choked Benton to a state of unconsciousness, leading to his death.  Based on these falsifications, the Lucas County Coroner's office initially declared Benton's death to be the result of complications caused by seizures and thus "natural" causes.

In 2008, approximately four years after Benton's death in 2004, Plaintiffs first learned that he had died from injuries inflicted on him while in the custody of Lucas County.  The FBI began an investigation into Benton's death, during which Gray, Schmeltz, and Sheriff Telb made false statements to FBI agents to impede their investigation.  Gray falsely stated that he observed Benton "breathing and moving after the chokehold."  Schmeltz denied to FBI agents that he saw Gray use a chokehold on Benton.  Telb, who knew of all the events leading to Benton's death, denied to FBI agents that Gray used a chokehold on Benton, and made false statements to federal authorities.  During the course of the federal investigation, the coroner declared Benton's death a homicide.  Plaintiffs allege that the actions of Gray and Schmeltz in assaulting and strangling Benton were proximate causes of his death.

**B.  Procedural Background**

Plaintiffs filed their original complaint against Lucas County and named Defendants in state court on December 9, 2008, asserting § 1983 violations of Benton's rights under the Fourth, Eighth, and/or Fourteenth Amendments and various state law claims.  The case was removed to federal court.  In the meantime, the United States Department of Justice filed criminal indictments against the individual defendants in the Northern District of Ohio.  The Magistrate Judge stayed this case during the criminal proceedings.

A jury found Gray guilty of three counts, including deprivation of rights under color of law pursuant to 18 U.S.C. § 242 for acting with deliberate indifference to Benton's serious medical needs, and two counts of falsifying documents in violation of 18 U.S.C. § 1519.  Gray was sentenced to 36 months of imprisonment, and his conviction and sentence were affirmed. *United States v. Gray*, 692 F.3d 514 (2012), *cert. denied,* 133 S. Ct. 990 (2013).

A jury found Schmeltz guilty of one count of falsifying a document in violation of 18 U.S.C. § 1519 for failing to mention his shove of Benton or Gray's use of a chokehold in the "Corrections Officer Report" documenting the events leading up to Benton's death. Schmeltz was sentenced to twelve months and one day's imprisonment. His conviction was affirmed. *United States v. Schmeltz*, 667 F.3d 685 (6th Cir. 2011).

When the present case was reopened in October 2009, Gray, Schmeltz, and Telb filed motions for judgment on the pleadings and/or motions to dismiss, claiming qualified immunity and statutory immunity, among other defenses. The district court filed multiple orders granting the motions in part and denying them in part. Specifically, the district court denied Schmeltz's and Gray's motions as to the § 1983 claims of excessive force and failure to provide medical treatment on the grounds that they were not entitled to qualified immunity. The court also denied the motions of Schmeltz and Gray on the claim of assault and battery and Gray's motion as to the wrongful death claim, finding both ineligible for statutory immunity under Ohio Rev. Code § 2744.02. The court denied Telb qualified immunity on the claim that he failed to sufficiently train and supervise employees regarding the use of excessive force. Based on the state law claims against Schmeltz and Gray, the court also denied Telb's motion on liability imputed by virtue of Ohio Rev. Code § 311.05, which creates an exception from statutory immunity where a sheriff "ratifies the neglect of duty or misconduct in the office of the deputy."

Gray, Schmeltz and Telb appeal the district court's denial of qualified immunity regarding Plaintiffs' excessive force and failure to train claims. Specifically, they argue that the district court employed the wrong standard—a Fourth Amendment reasonableness standard—in assessing the excessive force claims, that Plaintiffs failed to allege sufficient injury regarding Schmeltz's shove of Benton, and that Gray's use of a chokehold did not violate a clearly established constitutional right. Telb also argues that the court erred in denying him statutory immunity, and that Plaintiffs did not allege facts sufficient to show that he "ratified" the behavior of Schmeltz and Gray.

## II.  ANALYSIS

### A.  Standard of Review

We review de novo a district court's denial of a motion to dismiss that raises either a qualified immunity defense or a statutory immunity defense under Ohio law.  *Sutton v. Metro. Gov't of Nashville & Davidson Cnty.*, 700 F.3d 865, 871 (6th Cir. 2012); *Chesher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007).  We likewise review de novo a motion for judgment on the pleadings, using the same standard as motions to dismiss.  *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008).  We construe the Plaintiffs' complaint in the light most favorable to them, and accept the complaint's allegations as true, drawing all reasonable inferences in favor of the Plaintiffs.  *Crugher v. Prelesnik*, 761 F.3d 610, 613 (6th Cir. 2014).  The defendant has the burden to show that the plaintiff failed to state a claim for relief.  *Id.* To survive a motion to dismiss, a complaint must present facts that, if accepted as true, sufficiently "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

### B.  Qualified Immunity Claims

To determine whether qualified immunity applies, we use a two-step analysis: "1) viewing the facts in the light most favorable to the plaintiff, we determine whether the allegations give rise to a constitutional violation; and 2) we assess whether the right was clearly established at the time of the incident."  *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001).  We address the claims of excessive force and the claim of a failure to train in turn.

### 1.  Excessive Force

Plaintiffs' complaint more than sufficiently alleges conduct by Schmeltz and Gray that violated Benton's constitutional right to be free of excessive force.  The complaint raised claims under "the Fourth, Eighth, and/or Fourteenth Amendments," but on appeal all parties agree that

the Fourteenth Amendment governs Plaintiffs' claims because he was a pretrial detainee at the time of his injury and death.

Excessive force claims can be resolved under the Fourth, Eighth and Fourteenth Amendments—the applicable amendment depends on the plaintiff's status at the time of the incident: a free citizen in the process of being arrested or seized; a convicted prisoner; or someone in "gray area[s]" around the two. *Burgess*, 735 F.3d at 472; *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002). When a free citizen claims that a government actor used excessive force during the process of an arrest, seizure, or investigatory stop, we perform a Fourth Amendment inquiry into what was objectively "reasonable" under the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008). These Fourth Amendment protections extend through police booking until the completion of a probable cause hearing. *Aldini v. Johnson*, 609 F.3d 858, 866-67 (6th Cir. 2010). When convicted prisoners bring claims of excessive force, we turn to the Eighth Amendment, which forbids the "unnecessary and wanton infliction of pain" that constitutes "cruel and unusual punishment," and specifically conduct that is malicious and sadistic. *Hudson v. McMillian*, 503 U.S. 1, 5, 7 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)); *United States v. Budd*, 496 F.3d 517, 531-32 (6th Cir. 2007). To violate the Fourteenth Amendment rights of free citizens not subject to search or seizure, the conduct of law enforcement officials must "shock[] the conscience," whether it be "malicious and sadistic" behavior in the context of a "fluid" and "dangerous" situation, or "deliberate indifference" when there is "reasonable opportunity to deliberate" before taking action. *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) (internal quotation marks omitted); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-53 (1998).

Until very recently, it was unclear which standard applied to excessive force claims brought by pretrial detainees. The Supreme Court has recently clarified, however, that when assessing pretrial detainees' excessive force claims we must inquire into whether the plaintiff shows "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). The inquiry is highly fact-dependent, and must take into account the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* It should also account

for "the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,'" *id.*, and defer when appropriate to "'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)). The Court further instructs:

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* This list is not exclusive. *Kingsley* also reaffirms that pretrial detainees cannot be subjected to "the use of excessive force that amounts to punishment," *id.* (quoting *Graham*, 490 U.S. at 395 n.10) precisely because they "cannot be punished at all," *id.* at 2475.

In light of this Fourteenth Amendment standard and the facts alleged in the complaint, Plaintiffs' excessive force claims should proceed. The alleged conduct of Schmeltz and Gray was knowing or purposeful and "objectively unreasonable," and each used force that "amount[ed] to punishment" of Benton. *Id.* at 2473. Taking into account all of the circumstances of that day, including the legitimate interests of law enforcement in preserving order and discipline, the allegations that Schmeltz and Gray inflicted gratuitous pain on Benton while he was handcuffed, culminating in his death, establish valid claims that both officers violated Benton's Fourteenth Amendment rights. We review the claims as to each defendant separately.

### a. Officer Jay M. Schmeltz

Plaintiffs plausibly allege that Schmeltz violated Benton's constitutional right to be free from excessive force. We have long recognized that a spontaneous assault by a prison guard on an inmate is grounds for an Eighth Amendment excessive force claim. *Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995); *Moore v. Holbrook*, 2 F.3d 697, 700-01 (6th Cir. 1993) (holding that an inmate's allegations that he was handcuffed in his cell and then beaten by prison guards would constitute a valid Eighth Amendment claim). Similarly, where an arrestee poses

no threat to others and is not trying to escape, an "unprovoked and unnecessary blow" violates the Fourth Amendment. *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988). We have held that throwing an unresisting, handcuffed arrestee to the floor and subsequently banging his head against the floor constitutes excessive force. *Phelps v. Coy*, 286 F.3d 295, 301-02 (6th Cir. 2002); *Dugan v. Brooks*, 818 F.2d 513, 516-17 (6th Cir. 1987) (holding that spontaneously striking an arrestee on the head, knocking him to the floor and causing serious injury, would violate his Fourth Amendment rights); *Adams v. Metiva*, 31 F.3d 375, 385 (6th Cir. 1994) (holding that continuing to spray mace in the face of an incapacitated arrestee would constitute excessive force).

Because the Fourteenth Amendment, like the Fourth Amendment, must look to whether the force used was objectively unreasonable, the inquiry in both contexts focuses on the force itself rather than the injury. We have long held that a plaintiff may "allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage." *Ingram v. City of Columbus*, 185 F.3d 579, 597 (6th Cir. 1999). "[T]he 'extent of the injury inflicted' is not 'crucial to an analysis of a claim for excessive force in violation of the Fourth Amendment.'" *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 407 (6th Cir. 2009) (quoting *Baskin v. Smith*, 50 F. App'x 731, 737 n.2 (6th Cir. 2002)). We look instead to whether "gratuitous violence" has been inflicted. *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006) (citing *Phelps*, 286 F.3d at 302). Even so, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," and the same principle applies to the Fourteenth Amendment. *Graham*, 490 U.S. at 396.

Schmeltz's shove of Benton—who was handcuffed, in a belly chain and leg irons—so that he fell and hit the wall and cement floor, violated Benton's rights under the Fourteenth Amendment. Schmeltz argues that Plaintiffs did not allege sufficient injury, but the complaint alleges that the shove caused him to fall "striking his head on the wall and falling straight to the floor," "unable in any way to break his fall." Moreover, we look primarily to whether gratuitous force was applied. Such force is clearly alleged here: without provocation, Schmeltz shoved the fully restrained Benton hard enough that he fell straight down onto cement, powerless to help

himself.  Schmeltz's argument that he was acting in a good faith effort to restore discipline rings hollow as nothing in the facts alleged suggests a loss of discipline or order at the time the shove occurred.  On the contrary, the complaint suggests that Benton was hardly in any condition to cause a disruption, having recently been treated for seizures and then beaten and maced by Lucas County employees—including Schmeltz—at the hospital, from which he was brought to the jail in a wheelchair, fully restrained and subdued.  Plaintiffs also allege that Schmeltz's action was borne of his "frustration" with Benton's *prior* resistant behavior in the hospital, leading to a reasonable inference that the shove was the kind of gratuitous punishment that the Fourteenth Amendment forbids.

Having determined that Schmeltz violated Benton's constitutional rights, we now turn to whether the law regarding the use of gratuitous force on a restrained detainee is clearly established.  To satisfy this second prong of the qualified immunity analysis, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Clemente v. Vaslo*, 679 F.3d 482, 490 (6th Cir. 2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The key inquiry is whether a defendant claiming qualified immunity "was on notice that his alleged actions were unconstitutional." *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 485 (6th Cir. 2014) (quoting *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009)).  The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Clemente*, 679 F.3d at 490 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).  We look first to Supreme Court decisions, then Sixth Circuit case law in order to determine if the right claimed was clearly established when the events occurred.  *Clemente*, 679 F.3d at 490.  The plaintiff "has the burden of showing that a right is clearly established," while the defendant "carries the burden of showing that the challenged act was objectively reasonable in light of the law existing at the time." *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009).

At the time of the incident, pretrial detainees had a clearly established right not to be gratuitously assaulted while fully restrained and subdued.  *See Pelfrey*, 43 F.3d at 1037.  Under the Fourteenth, Fourth, or Eighth Amendments, assaults on subdued, restrained and nonresisting detainees, arrestees, or convicted prisoners are impermissible.  *Id.*; *Phelps*, 286 F.3d at 301-02

(citing cases).  The facts alleged show that Schmeltz assaulted the fully restrained Benton so that he fell and hit his head on the cement floor.  Schmeltz then attempted to cover up the assault by filing false reports and lying to federal investigators after Benton's death.  These actions reasonably lead us to conclude that Schmeltz violated clearly established law and was "on notice that his alleged actions were unconstitutional."  *United Pet Supply, Inc.*, 768 F.3d at 485.  Schmeltz's argument that his actions did not violate clearly established law fails.

    **b**.  **Sergeant John E. Gray**

Plaintiffs have also plausibly alleged that Gray violated Benton's constitutional rights.  The use of a chokehold on an unresisting—and even an initially resistant—detainee violates the Fourteenth Amendment.  *Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993).  It is a constitutional violation for law enforcement officials to use violent physical force "totally without penological justification."  *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).  A chokehold rendering an arrestee unconscious and causing his death constitutes excessive force under Fourth Amendment standards.  *United States v. Livoti*, 196 F.3d 322, 327 (2d Cir. 1999); *Papp v. Snyder*, 81 F. Supp. 2d 852, 857 (N.D. Ohio 2000) (holding that "[n]o reasonable officer would use a choke hold and a carotid sleeper hold on a suspect who is both handcuffed and restrained by four other individuals"); *see also Haynes v. Marshall*, 887 F.2d 700, 703 (6th Cir. 1989) (holding that qualified immunity was clearly inappropriate where prison officials beat a disruptive inmate in need of anti-psychotic medication and left him to die).

Gray's actions violated Benton's Fourteenth Amendment rights.  Having had time to consider his options while escorting Benton to the medical cells, and while attempting to remove Benton's multiple restraints, Gray chose to act in a manner that Plaintiffs plausibly allege was the product of frustration and anger, designed to punish and cause harm rather than a good faith effort to maintain discipline.  Although Benton admittedly began to "squirm around" and struggle, at the point Gray choked him Benton had been placed on the bed, handcuffed to it, and was surrounded by multiple officers.  In that situation, force as extreme as a chokehold was excessive and impermissible, and by the point Gray heard Benton choke and gurgle and another officer urged Gray to release the chokehold, Gray's conduct was clearly objectively

unreasonable.  Gray's actions after the fact—telling other officers to leave the medical cell after Benton was rendered unconscious and his restraints removed, failing to seek medical help, and refusing to mention his use of a chokehold on incident reports—also lead to the inference that Gray was aware he had violated the law and sought to avoid liability.  Where, as here, a law enforcement official inflicts pain and punishment—even on a resistant detainee—to the point of death and then leaves that individual to die, he violates that detainee's constitutional rights.  *See Haynes*, 887 F.2d at 703.

Having determined that Gray violated Benton's constitutional rights, we turn again to whether the right in question—to be free from deadly physical force such as a chokehold while fully restrained—was clearly established, providing Gray notice that "what he [was] doing violate[d] that right." *Clemente*, 679 F.3d at 490 (6th Cir. 2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Our cases make it abundantly clear that it is constitutionally impermissible to abuse a shackled prisoner to the point of death and then leave him to die in his cell.  *Haynes*, 887 F.2d at 703.  Chokeholds are objectively unreasonable where an individual is already restrained or there is no danger to others.  *Livoti*, 196 F.3d at 327; *Papp*, 81 F. Supp. 2d at 857.

Gray's actions as described in the complaint violated clearly established law: Gray put Benton in a chokehold and continued to choke him even after Gray heard him gurgling and another officer told Gray to stop, and Gray left Benton in his cell without medical care.  Gray's efforts to hide evidence of his actions, by filing false reports and lying to federal investigators, reasonably lead to the conclusion that he knew he had violated the law.  In short, like Schmeltz, Gray behaved like someone who "was on notice that his alleged actions were unconstitutional." *United Pet Supply, Inc.*, 768 F.3d at 485.  Gray's argument that his actions did not violate clearly established law thus also fails.

## 2.  Failure to Train and Supervise

Telb's appeal of this § 1983 claim addresses only the allegation that he individually failed to train and supervise his staff, particularly Schmeltz and Gray.  Telb argues that Schmeltz and Gray satisfy both prongs of the qualified immunity test—their actions did not violate Benton's constitutional right to be free from excessive force and the right claimed was not clearly

established.  Telb's entire analysis is based on the argument that because Schmeltz and Gray are eligible for qualified immunity for their actions, it necessarily follows that he, too, should be eligible for qualified immunity regarding the failure to train and supervise claim.  Because we find that Schmeltz and Gray do not satisfy the requirements for qualified immunity, Telb's argument fails.  We also review the claim against him directly.

A § 1983 claim of personal liability for a failure to train and supervise differs from a § 1983 claim against a municipality for a failure to train and supervise.  In order to establish personal liability for a failure to train and supervise

> [t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.  *At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.*

*Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (emphasis in original) (quoting *Bradley v. Bellamy*, 729 F.2d 416, 421 (6th Cir. 1984)).

Plaintiffs allege that Telb had a duty to train and supervise employees of the Sheriff's Department to avoid the use of excessive force and to ensure that the medical needs of persons in the Sheriff's custody were met.  They then allege that Telb failed to train and supervise staff regarding the proper use of force and failed to investigate properly allegations of excessive force.  This failure to train and supervise specifically included a failure to train on "the use of a chokehold and the injuries derived therefrom" which action resulted in Benton's "injuries and death."  Plaintiffs also allege that Telb had "full knowledge of the assault on Carlton Benton . . . but nonetheless intentionally and deliberately made false statements to federal officials about [his] knowledge of Defendant Schmeltz's assault and Defendant Gray's chokehold and the deliberate failure to provide medical attention to Benton."  These allegations are sufficient to show that Plaintiffs have established a valid claim under § 1983, insofar as they have shown that Telb "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate" when he helped Schmeltz and Gray to cover up their unconstitutional actions.  *Taylor*, 69 F.3d at 81 (quoting *Bradley*, 729 F.2d at 421).  Given Schemltz and Gray's constitutional violations as well as the sufficiency of Plaintiffs' allegations

in establishing Telb's potential personal liability for his failure to train and supervise under § 1983, Telb has not shown entitlement to qualified immunity on this claim.

**C.  Statutory Immunity for Ohio State Law Claims**

Finally, the complaint also alleged a number of state law claims against Schmeltz and Gray—excessive force, failure to provide medical care, assault and battery, and wrongful death—that are imputed to Telb by virtue of Ohio Rev. Code § 311.05.  Telb challenges the district court's denial of statutory immunity to him for those claims.

Claims brought against Telb in his official capacity are the equivalent of claims brought against the county as a government entity.  *Chesher*, 477 F.3d at 796-97.  There is a three-tiered analysis involved in determining whether a political subdivision is immune from liability under Ohio law.  *Range v. Douglas*, 763 F.3d 573, 582-83 (6th Cir. 2014) (citing *Lambert v. Clancy*, 927 N.E.2d 585, 588 (Ohio 2010)); *Elston v. Howland Local Schs.*, 865 N.E.2d 845, 848 (Ohio 2007).  First, the court must determine if an entity qualifies for the general grant of immunity under Ohio Rev. Code § 2744.02: "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."  Ohio Rev. Code Ann. § 2744.02(A)(1).  Federal courts have held that sheriffs and sheriff's deputies are considered employees of the county, which is a political subdivision of the state.  Ohio Rev. Code Ann. § 2744.01(F); *Sanford v. Cnty. of Lucas*, No. 3:07 CV 3588, 2009 WL 723227, at * 1, 8 (N.D. Ohio, Mar. 16, 2009) (citing cases).

Second, the court must determine if any of the exceptions to immunity apply.  *Lambert*, 927 N.E.2d at 588.  The exceptions include injuries, death or losses caused by various forms of negligence, or "when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code."  Ohio Rev. Code Ann. § 2744.02(B)(1)-(5).

Third, if an exception applies, the court assesses whether any of the defenses to liability listed in Ohio Rev. Code § 2744.03 apply, enabling immunity to be reinstated.  *Lambert*, 927 N.E.2d at 588.  Whether an individual is personally liable is also assessed under Ohio Revised Code § 2744.03(A)(6), which provides that an employee is personally immune from

liability unless "(a) [t]he employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) [t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or] (c) [c]ivil liability is expressly imposed upon the employee by a section of the Revised Code." *Id.* (quoting Ohio Rev. Code § 2744.03(A)(6)).

The district court found that Plaintiffs pled facts sufficient to allege that Telb was liable under a separate Ohio statute, Ohio Rev. Code § 311.05, and therefore the exception to immunity stated under Ohio Rev. Code § 2744.02(B)(5) applies. Ohio Rev. Code § 311.05 provides that "[t]he sheriff shall only be responsible for the neglect of duty or misconduct in office of any of his deputies if he . . . ratifies the neglect of duty or misconduct in office of the deputy." "[R]atification can be shown by inaction or silence where the principal is fully informed of all of the material facts to the agent's action." *Amato v. Heinika Ltd.*, No. 84479, 2005 WL 110441, at *1, 2 (Ohio Ct. App. Jan. 20, 2005). An individual has ratified an act if he is aware of the agent's act and "takes a position inconsistent with non-affirmance. . . ." *Id.* "Evidence of tortious wrongdoing on the part of the deputies must be established before liability can be imputed to the sheriff." *Smith v. Redecker*, No. 08CA33, 2010 WL 541355, at *1, 10 (Ohio Ct. App., Feb. 4, 2010) (per curiam).

Telb argues that Plaintiffs' state law claims fail because Plaintiffs did not restate the pertinent factual allegations in the specific causes of action. Telb Br. at 29. But neither *Iqbal* nor *Twombly* requires such a crabbed reading of a complaint—rather, the language in both opinions refers repeatedly to the "complaint" in full. *See Iqbal*, 556 U.S. at 679-684; *Twombly*, 550 U.S. at 554-570. Moreover, under each cause of action, Plaintiffs included a statement by which they "reincorporate[d] and reallege[d] preceding statements and allegations as if expressly set forth herein." The court's function is to construe a complaint in order "to do justice," Fed. R. Civ. P. 8(e), and in doing so it must look to the complaint "as a whole" to see if it provides "sufficient notice" of the claim. *Moore v. City of Harriman*, 272 F.3d 769, 773 (6th Cir. 2001). *See also Argueta v. U. S. Immigration & Customs Enforcement*, 643 F.3d 60, 74 (3d Cir. 2011) ("We also recognize that *Iqbal* made it clear that courts must determine whether the complaint *as a whole* contains sufficient factual matter to state a facially plausible claim. . . .") (emphasis

added); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (holding that heightened pleading standards of the Private Securities Litigation Reform Act require courts to "consider the complaint in its entirety" and examine "all of the facts alleged, taken collectively"). For these reasons, we reject the argument that Telb constructs based on the structure of the complaint.

As discussed above, the complaint as a whole alleges facts sufficient to state claims that Schmeltz and Gray engaged in "tortious wrongdoing": specifically, "wrongful death" and "assault and battery." *Redecker*, 2010 WL 541355, at *10. Plaintiffs allege that Telb "had full knowledge of the assault on [] Benton, which led to his death, but nonetheless intentionally and deliberately made false statements to federal officials" concerning both Schmeltz's shove of Benton and Gray's chokehold, as well as the failure to provide medical attention to Benton. Plaintiffs allege Telb falsely denied to FBI officials that Gray used a chokehold on Benton. The allegations of the complaint as a whole provide "fair notice" to Defendant not only of the "nature of the claim, but also grounds on which the claim rests." *Twombly*, 550 U.S. at 555 n.3 (internal quotation marks omitted).

Plaintiffs have thus alleged facts sufficient to state a claim that Telb "ratified" the conduct of his subordinates and therefore is potentially officially liable under Ohio Revised Code § 311.05. For this same reason, Telb is also ineligible for any defense to personal liability available under Ohio Rev. Code § 2744.03(A)(6)(c) (providing that an employee is personally immune from liability unless "[c]ivil liability is expressly imposed upon the employee by a section of the Revised Code"). *Lambert*, 927 N.E.2d at 588; *Shoup v. Doyle*, 974 F. Supp. 2d 1058, 1089-90 (S.D. Ohio 2013). In light of this finding, there is no need for the court to address whether Plaintiffs alleged facts sufficient to state a claim that Telb's conduct also amounted to "bad faith."

## III. CONCLUSION

The facts alleged by Plaintiffs are more than sufficient to state claims that the conduct of Schmeltz, Gray, and Telb violated Benton's Fourteenth Amendment rights. At the time of the events alleged in the complaint, those rights were clearly established. We therefore AFFIRM the district court's orders denying qualified immunity to Defendants Schmeltz, Gray, and Telb

regarding Plaintiffs' claims of excessive force and failure to train. We also AFFIRM the district court's orders denying statutory immunity under Ohio law to Telb. We remand the case to the district court for expeditious handling in light of the delay entailed by these appeals.