**NOT RECOMMENDED FOR PUBLICATION**
File Name: 21a0155n.06

**No. 19-5464**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED-INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC, LOCAL UNION 1693, <br><br>     Plaintiffs-Appellants, <br><br> v. <br><br> LLFLEX, LLC, <br><br>     Defendant-Appellant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **FILED** <br> Mar 24, 2021 <br> DEBORAH S. HUNT, Clerk <br><br><br> ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |

BEFORE: BATCHELDER, GRIFFIN, and STRANCH, Circuit Judges.

GRIFFIN, J., delivered the opinion of the court in which BATCHELDER, J., joined. STRANCH, J. (pp. 10–14), delivered a separate opinion concurring in part and dissenting in part.

GRIFFIN, Circuit Judge.

Plaintiffs contend defendant violated a collective bargaining agreement by changing retiree healthcare benefits and then refusing to arbitrate plaintiffs' grievance regarding those changes. The district court dismissed plaintiffs' complaint, concluding plaintiffs lacked Article III standing, and, alternatively, plaintiffs' complaint failed to state a claim upon which relief could be granted. For the reasons we state below, we affirm the district court's judgment.

I.

Defendant LLFlex, LLC ("the Employer") and plaintiffs United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union, AFL-CIO-CLC, and its Local No. 1693 (collectively, "the Union") are parties to a collective bargaining agreement ("CBA") effective "September 1, 2017 through August 31, 2020." In January 2018, the Employer began requiring certain retirees—namely those who retired by June 29, 2017 (i.e., before the operative agreement became effective)—"to pay a share of the premium cost of [their] healthcare benefits." Displeased with the change, the Union filed a grievance under the CBA for this "unilateral imposition of premium costs to retirees in violation of the parties' agreements." The parties did not resolve the dispute through the CBA's grievance process (and in so doing, the Employer refused to arbitrate the grievance).

Thereafter, the Union initiated this lawsuit, asking the district court to order the Employer "to arbitrate the grievance pursuant to the . . . CBA[.]" The Employer moved to dismiss, arguing under Federal Rule of Civil Procedure Rule 12(b)(1) that the district court lacked subject-matter jurisdiction because the Union did not have standing, and, alternatively, that the Union failed to state a claim upon which the district court could grant relief under Federal Rule of Civil Procedure 12(b)(6) because the disputed grievance was not arbitrable. The district court agreed with the Employer on both grounds and dismissed the complaint. The Union timely appeals.

II.

We review a Rule 12(b)(1) facial-attack decision and a Rule 12(b)(6) decision de novo. *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 553 (6th Cir. 2012). For each type of motion to dismiss, we accept non-conclusory factual allegations in the complaint as true. *See Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). But for

either kind of motion to dismiss, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009) (citation omitted); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009). To withstand a Rule 12(b)(1) facial attack on subject matter jurisdiction, the complaint's allegations must establish a federal claim. *See O'Bryan*, 556 F.3d at 376. "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must present facts that, if accepted as true, sufficiently 'state a claim to relief that is plausible on its face.'" *Coley v. Lucas Cty.*, 799 F.3d 530, 537 (6th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible when a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### III.

"[A] collective bargaining agreement is . . . a contract[.]" *Morgan Servs., Inc. v. Local 323, Chicago & Cent. States Joint Bd., Amalgamated Clothing & Textile Workers Union*, 724 F.2d 1217, 1223 (6th Cir. 1984) (citation omitted). "[A] party to a breached contract has a judicially cognizable interest for [Article III] standing purposes, regardless of the merits of the breach alleged." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 463 (6th Cir. 2020) (first alteration in original) (quoting *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 716 (8th Cir. 2017)). Here, the Union essentially contends that the Employer breached their contract by refusing to arbitrate a dispute that the Union claims the parties agreed to arbitrate. Accordingly, we disagree with the district court and conclude that the Union possesses Article III standing to pursue this lawsuit in federal court.

IV.

A.

As mentioned above, "[a] collective bargaining agreement is . . . a contract." *Morgan Services*, 724 F.2d at 1223 (citation omitted). And we "interpret CBAs under 'ordinary principles of contract law.'" *Int'l Union, United Auto., Aerospace & Agric. Implement Workers Of Am. v. Honeywell Int'l, Inc.*, 954 F.3d 948, 954 (6th Cir. 2020) (quoting *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 430 (2015)). One of those ordinary principles of contract law is "that courts interpret contracts according to their plain meaning." *Rogers v. I.R.S.*, 822 F.3d 854, 860 (6th Cir. 2016) (citation omitted); *Dobbs, Inc. v. Local No. 614, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 813 F.2d 85, 88 (6th Cir. 1987) ("Terms in a collective bargaining agreement are to be given their ordinary meaning in the absence of 'evidence indicating that the parties to this contract intended to expand or otherwise deviate from that meaning.'" (citation omitted)).

"Before compelling an unwilling party to arbitrate, [we] must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003) (citing *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). The following principles guide our inquiry:

> (1) a party cannot be forced to arbitrate any dispute that it has not obligated itself by contract to submit to arbitration; (2) unless the parties clearly and unmistakably provide otherwise, whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is an issue for judicial determination; (3) in making this determination, a court is not to consider the merits of the underlying claim; and (4) where the agreement contains an arbitration clause, the court should apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate "unless it may be said with positive assurance

that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."

*United Steelworkers of Am. v. Mead Corp., Fine Paper Div.*, 21 F.3d 128, 131 (6th Cir. 1994) (quoting *AT & T Techs.*, 475 U.S. at 648–51).

## B.

Because the CBA contains an arbitration clause, the presumption of arbitrability applies, and therefore the issue is whether there is "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute" to overcome this presumption. *Id.* (quoting *AT & T Techs.*, 475 U.S. at 648–51). We agree with the district court that the CBA's narrowly-written arbitration clause is not susceptible of an interpretation that covers the Union's desire to arbitrate whether the collective bargaining agreement prohibited the Employer from unilaterally changing the applicable retiree healthcare benefits.

First and most importantly, the arbitration clause at issue is materially different from arbitration clauses that we have recognized as "broad," which we only set aside when there is either "an express provision" or "the most forceful evidence" excluding the claim from arbitration. *Id.* (quoting *AT&T Techs.*, 475 U.S. at 650). In those cases, the phrasing usually involves language like "any dispute," "any disagreement," or "any difference of opinion" regarding the interpretation or application of the collective bargaining agreement. *See, e.g.*, *Teamsters Local Union No. 89 v. Kroger Co.*, 617 F.3d 899, 905 (6th Cir. 2010) ("any grievance[,] dispute[,] or complaint over the interpretation or application of the contents of this Agreement" asserted by "any employee") (alterations in original and citation omitted)); *Cleveland Elec. Illuminating Co. v. Util. Workers Union of Am.*, 440 F.3d 809, 814 (6th Cir. 2006) ("the following grievance procedure shall be used by the Union to settle or adjust any disagreement concerning the interpretation or application of this Agreement"); *Int'l Ass'n of Machinists & Aerospace Workers v. ISP Chemicals, Inc.*, 261 F.

App'x 841, 846 (6th Cir. 2008) ("any difference of opinion or dispute . . . regarding interpretation or application of any provision of this Agreement" (alteration in original and citation omitted)).

The collective bargaining agreement in this case, however, has no equivalent "any dispute" language, let alone language that delegates the issue of arbitrability to an arbitrator. *See, e.g.*, *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 844–46 (6th Cir. 2020). Instead, as discussed above, grievances get filtered through the grievance committee on their way to arbitration, and the contract limits the committee to certain types of grievances—"any grievances or differences that might arise between the Company and the employees *as to working conditions, discharges, seniority rights, layoff and re-employment*." (Emphasis added).

Second, it is clear that the alleged retiree benefits are not within the CBA's "substantive scope." *Javitch*, 315 F.3d at 624. Simply put, the benefits the Union seeks to arbitrate are not contained in the CBA at issue. In this regard, the absence of the retiree benefits in the CBA establishes the "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute" regarding those benefits. *Mead Corp.,* 21 F.3d at 131 (quoting *AT & T Techs.*, 475 U.S. at 648–51).

The Union contends that we lack the authority to assess whether the retiree benefits are in the agreement because (a) to do so would necessarily involve addressing the merits of the underlying dispute and (b) "it is not for the courts to weigh the merits of a grievance or to undertake to determine the rights of parties under a collective bargaining agreement." *General Drivers, Salesmen, and Warehousemen's Local Union No. 984 v. Malone & Hyde, Inc.*, 23 F.3d 1039, 1043 (6th Cir. 1994). But we "cannot avoid [our] duty [to determine whether parties agreed to arbitrate a given dispute] because it requires us to interpret a provision of a bargaining agreement." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 209 (1991); *Int'l Bhd. of Teamsters v. Pepsi-Cola*

*General Bottlers*, 958 F.2d 1331, 1333 (6th Cir. 1992) ("In the context of an expired collective bargaining agreement, however, the Court must determine whether the parties intended to arbitrate the dispute, even if it requires the Court to interpret a provision of the expired agreement."); *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Am. Standard Corp.*, 487 F. App'x 234, 237 (6th Cir. 2012) ("[W]e may touch upon the merits of the underlying dispute in order to decide the arbitrability question.").

We acknowledge that the CBA references *prior* retiree benefits, but that does not change our analysis. It states:

> (h) (Historical) The retiree medical provisions were modified as follows: effective June 30, 2017, retiree medical Eligibility was terminated. Anyone who did not retire under the DB plan by June 29, 2017 is not eligible for retiree medical coverage.

Plaintiffs read this language as providing "for a pre-age 65 retiree healthcare program for those bargaining unit employees who retired from the Company by June 29, 2017," reflecting the parties' intent "to end eligibility for the retiree healthcare program for those who retired after June 29, 2017, but to continue it for those who did" and showing a bargain to continue—unmodified for the term of the CBA in the record—the retiree benefits of the employees who retired by June 29, 2017. We disagree. The parenthetical "Historical" and the description of events that occurred in the past indicate that subsection (h) is only informational and is not indicative of a bargain over or an establishment of retiree benefits. *See RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1140 (6th Cir. 1996) (acknowledging that language in a contract can be "informational only"). Moreover, the agreement's silence regarding the establishment of the alleged retiree benefits, their contours, and how—if at all—they can be modified is an insufficient basis for concluding that the parties bargained for them. *Cf. Tackett*, 574 U.S. at 442 ("[W]hen a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those

benefits to vest for life."). At most, as the district court pointed out, *this* agreement suggests that the relevant retirees "may have rights under a *prior* agreement." *United Steel, Paper & Rubber, Mfg., Energy, Allied-Indus. & Serv. Workers Int'l Union, AFL-CIO-CLC v. LLFlex, LLC*, No. 3:18-CV-00495-GNS, 2019 WL 1410911, at *2 n.1 (W.D. Ky. Mar. 28, 2019). But that says nothing about their rights under *this* agreement.

Third, the CBA's four-step grievance procedure—of which the arbitration clause is a part—is incompatible with the grievance at issue in this case. That procedure provides four escalating steps to "any employee who feels that he/she has a just grievance," from the employee's immediate supervisor (Step 1), to the Manufacturing or Plant Manager and grievance committee (Step 2), to the Plant Employee Relations Manager (Step 3), and then to arbitration (Step 4). With one exception not important here, a critical aspect of the grievance process is that the grievance committee—which is duty bound "to make an earnest effort to settle any grievances or differences that might arise between the Company and the employees as to working conditions, discharges, seniority rights, layoff and re-employment"—must find unsatisfactory "the decision of the Manufacturing or Plant Manager and/or his/her representative" and then escalate the grievance to Steps 3 and/or 4. Benefits of people who retired *before* the CBA became operative do not fit within any of these categories. The mismatch between the types of grievances that can make it to arbitration and the grievance at issue here further supports the "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Mead Corp.*, 21 F.3d at 131 (quoting *AT & T Techs.*, 475 U.S. at 648–51).

Finally, and relatedly, the same can be said for the contract's "Purpose of Agreement" article. Appearing immediately before the "Grievance Procedure" article, it explains that the CBA "concern[s] rates of pay, hours of work and other conditions of employment under which the

employee works." Retirees are not employees. *See Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 168 (1971) ("The ordinary meaning of 'employee' does not include retired workers; retired employees have ceased to work for another for hire."). The alleged retiree benefits therefore do not fit within the subjects identified in the contract's purpose article.

For these reasons, we hold that the presumption of arbitrability is overcome and the asserted dispute is not arbitrable.

V.

We affirm the judgment of the district court.

**JANE B. STRANCH, Circuit Judge, concurring in part and dissenting in part.** I agree with the majority that the Union has Article III standing. But because I believe that the arbitration clause at issue here covers the parties' dispute, I respectfully dissent from the remainder of the majority opinion.

The presumption in favor of arbitration of labor contracts is based on congressional policy "recognizing arbitration as a 'substitute for industrial strife,'" and "the belief that arbitrators, more so than the courts, possess the proper experience and expertise to resolve labor disputes." *United Steelworkers of Am. v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 278 (6th Cir. 2007) (quoting *Int'l Union v. Cummins*, 434 F.3d 478, 485 (6th Cir. 2006)). This presumption is particularly important when the arbitration clause at issue is broad—in such cases, arbitration "will be denied only if an express provision excludes a particular grievance from that forum." *Bakery, Confectionery, Tobacco Workers & Grain Millers, Int'l Union AFL-CIO v. Kellogg Co.*, 904 F.3d 435, 442 (6th Cir. 2018) (quoting *Cummins*, 434 F.3d at 486)). When an arbitration clause "is 'equally consistent with opposing interpretations, and the language employed does not clearly and unambiguously describe[ ] the issue or issues excluded from arbitration, the . . . language cannot be said to *expressly exclude* that issue.'" *Id.* at 444 (quoting *Int'l Ass'n of Machinists v. ISP Chems., Inc.*, 261 F. App'x 841, 847 (6th Cir. 2008)). Thus, when "we cannot say with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," we must "resolve any doubts in favor of arbitration." *Id.* (quoting *ISP Chems.*, 261 F. App'x at 849). If the language of a collective bargaining agreement is ambiguous, extrinsic evidence may be considered. *Id.* at 443.

As the majority agrees, courts have typically found that arbitration clauses "covering all disputes arising from a collective bargaining agreement" are "broad." *Id.* Here, the grievance

procedure, which culminates in arbitration, is available to "any employee who feels that he/she has a just grievance." That is an archetypally broad arbitration provision, as is illustrated by the majority's own examples.

The majority concludes, however, that the arbitration clause is not "broad" because grievances are filtered through the grievance committee, which, the majority believes, may only consider "any grievances or differences that might arise between the Company and the employees as to working conditions, discharges, seniority rights, layoff and re-employment." But that is not what the CBA says. The grievance committee becomes involved at the end of the second step of the grievance procedure, when it evaluates whether the disposition of the grievance by management has been satisfactory or whether it needs to be escalated to the next step. The CBA does not define the term "grievance." Instead, the majority opinion finds its limitation on the committee's authority in subsection A of Article XV, which creates the committee and gives it the "duty" of making "an earnest effort to settle grievances between the Company and the employees as to working conditions, discharges, seniority rights, layoff and re-employment." (CBA Art. XV(A), R. 5-1, PageID 57) But that language simply charges the committee with its principal responsibility: nothing in it prohibits the committee from advancing, or employees from bringing, "just grievance[s]" that fall into other categories. It thus does not narrow the broad provision for arbitration, and we should deny arbitration "only if an express provision excludes a particular grievance from that forum." *Kellogg*, 904 F.3d at 442. And whether the arbitration provision is broad or not, we must still have "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 444 (quoting *ISP Chems.*, 261 F. App'x at 849). This CBA provides no such express provision or positive assurance.

Lacking positive assurance, the majority opinion can rely only on a series of inferred conclusions attenuated from the plain language of the contract: that retiree benefits are not within the CBA's substantive scope; that the CBA applies only to working employees; and that there is a mismatch between the grievance procedure and the grievance at issue here.

It first says the agreement at most suggests that "the relevant retirees 'may have rights under a *prior* agreement'" and so concludes "it is clear" that retiree benefits are not within the "substantive scope" of the CBA. *See Javitch v. First Union Securities*, 315 F.3d 619, 624 (6th Cir. 2003)). An examination of the entire agreement demonstrates that this is far from clear.

The CBA sets out a current health and welfare fund that provides medical, dental, and vision insurance to employees. It also explains that the Employer sponsors a pension plan (a defined benefit or DB Plan) that is incorporated into the CBA by reference. Its subsection h provides:

> (Historical) The retiree medical provisions were modified as follows: effective June 30, 2017, retiree medical Eligibility was terminated. Anyone who did not retire under the DB plan by June 29, 2017 is not eligible for retiree medical coverage.

(CBA Art. XIX(1)(h), R. 5-1, PageID 66) This language indicates both that those who did not retire by June 29, 2017 are not eligible for coverage AND that those who retired by June 29 and signed up for coverage by June 30, 2017 *are* eligible. Use of the definite article "the" in the phrase "*[t]he* retiree medical provisions" in a subpart of the section on the DB Plan is significant. It shows that the retiree eligibility provisions in subsection (h) refer to modifications to specific provisions in the pension plan or employee medical plan—plans that were incorporated into the CBA by reference. *See St. Clair v. Com.*, 451 S.W.3d 597, 625 (Ky. 2014) (observing, in the context of statutory interpretation, that "[t]he use of the definite article, the word 'the,' signals a specific thing"). The Complaint alleges that "Article XIX of the current and previous CBA, *along*

*with the corresponding incorporated insurance plans*, provide for a pre-age 65 retiree healthcare program for those bargaining unit employees who retired from the Company by June 29, 2017." (Emphasis added.)  The parenthetical "Historical" and the use of the past tense does not render merely informational a substantive provision contained in plans that are themselves incorporated into the CBA by reference.

Second, the majority opinion turns to the "Purpose of the Agreement," which says that the CBA "concern[s] rates of pay, hours of work and other conditions of employment under which the employee works."  (CBA Art. XIV, R. 5-1, PageID 57)  It argues that retirees are excluded from the CBA and its arbitration provision because they are not employees.  But, similar to the provision creating the grievance committee, the "Purpose" provision does not express a limitation on the scope of the CBA. It simply describes the general purpose of the parties—the Union and the Company—which it then ties to the parties' general goal of "promot[ing] sound industrial and economic relations between the parties, and establish[ing] a basis for securing the cooperation and goodwill that exists between the Company and the Union."  (*Id.*)

More to the point, other sections of the CBA show that the term "employees" here includes former employees.  Article I of the CBA, entitled "Recognition," reads in part as follows:

A.  The Provisions of this Agreement shall apply solely to those employees located in Louisville, Kentucky, for whom the Union has been certified as the exclusive bargaining agency by the National Labor Relations Board, or for whom the Company has recognized the Union as the exclusive bargaining agency.

B. The Provisions of this Agreement shall apply to all employees assigned to perform production work but specifically excludes supervisory workers, machinists, roll grinders, tool and die makers, electricians and apprentices, quality assurance workers, security guards, office employees, supervisors, engineers or other direct representatives of the Company.

(CBA Art. I, R. 5-1, PageID 29)  Retired employees are not excluded.  And some "[p]rovisions of th[e] Agreement" apply to retirees because retirees are repeatedly mentioned in the subsection

entitled Group Insurance and Benefits, which is devoted to the DB Plan and its various amendments. (CBA Art. XIX, R. 5-1, PageID 65–69) The use of the word "employees" in Article I does encompass retirees—if it didn't, the "Provisions of th[e] Agreement" that relate specifically to retirees would be meaningless, violating the rule that "every part of [an] instrument will be given meaning and effect when possible." *Hensley v. Gadd*, 560 S.W.3d 516, 521 (Ky. 2018). And, under standard principles of contract law, a word used in a contract is presumed to have the same meaning throughout. *See EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 290 (Ky. Ct. App. 2019).

Finally, the majority opinion finds the grievance procedure incompatible with the grievance at issue here based on its view that the grievance committee may consider only the types of grievances specified in Article XV. I have already explained why this interpretation strains the language of that provision, finding limitation where none exists. But I also note that the Union's grievance is compatible with the grievance procedure—the parties in fact employed that procedure. The Union alleges that it filed a grievance on behalf of the retirees and pursued it through the first three steps of the CBA's process. The grievance was processed through step three, and that could not have occurred unless the parties to the CBA advanced it through those steps.

For all these reasons, I would conclude that the CBA's broad arbitration clause covers the Union's dispute. I therefore respectfully dissent from the dismissal of the Union's complaint.